[No. H001108. Sixth Dist. Dec. 28, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
THEREZA GOES MACIOCE, Defendant and Appellant.

**COUNSEL**

Gretchen O. Burford, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael I. Mintz and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**BRAUER, J.**—Appellant Thereza Goes Macioce stabbed her husband in the back, and thereby killed him. A jury found her guilty of murder in the second degree. (Pen. Code, §§ 187, 189.) She was sentenced to serve a term of 15 years to life in the state prison. She appeals from the judgment of conviction.

On appeal she contends (1) that the trial court erred in denying her pretrial motion to suppress evidence obtained after a warrantless entry and search of her apartment; (2) that the prosecutor used peremptory challenges systematically to exclude women, and particularly "battered women," from the jury; and (3) the trial court erred in finding a witness unavailable, and in allowing the former testimony of the witness to be read to the jury.

We find no error which warrants a reversal, and we therefore affirm the judgment.

### I. Basic Background

Mrs. Macioce does not challenge the sufficiency of the evidence which supports her conviction. But because she claims the evidence was unlawfully obtained, we describe the circumstances leading to its discovery.[1]

On the night of Tuesday, August 21, 1984, Officer Rosario was driving a police car on routine patrol in San Jose. At 10:58 p.m. two male citizens in a passing automobile flagged him down. Together the citizens related to Rosario the following information:

Both citizens belonged to the religious group known as Jehovah's Witnesses. Appellant Macioce and her husband, Giovanni, also were members of the same organization. The Macioces, who normally attended Witness

---

[1] Macioce did not renew her motion to suppress evidence at trial. Therefore our recital of facts is limited to the evidence presented at the pretrial motion. (*People v. Johnson* (1984) 162 Cal.App.3d 1003, 1010, fn. 4 [209 Cal.Rptr. 78]; *People v. Robinson* (1974) 41 Cal.App.3d 658, 663 [116 Cal.Rptr. 455]; cf. *People v. Werber* (1971) 19 Cal.App.3d 598, 602-603 [97 Cal.Rptr. 150] [no renewal of motion at trial] with *People v. Bryant* (1970) 5 Cal.App.3d 563, 565 [85 Cal.Rptr. 388] [renewal at trial].)

meetings faithfully, missed a meeting the previous Sunday, August 19. On succeeding days both citizens made numerous attempts to contact the Macioces by telephone and by knocking on the door of the Macioce apartment, but they received no response. Giovanni Macioce had been scheduled to undergo knee surgery on Monday, August 20, but he did not appear. The only automobile the Macioces owned was parked in a carport, and mail had accumulated in the apartment's mailbox. The Macioces were not likely to be out of town because they were extremely poor and could barely afford the rent. About 20 minutes before they encountered Rosario (i.e., around 10:30 p.m.), the citizens had gone to the Macioce apartment and knocked on the door, but still had received no response. They were concerned about the welfare of the Macioces.

Officer Rosario followed the citizens to the Macioce apartment, which was located on the second floor of a two-story apartment complex. Rosario noticed a large accumulation of mail in the apartment's mailbox. He then contacted the manager of the complex, who told him that she had not seen either of the Macioces for a few days. The manager provided Rosario with a spare key to the apartment.

Rosario, the citizens, and the manager all went to the door of the apartment. Affixed to the door was a note which read, as Rosario recalled, " 'I had been here, I'll call later,' or something to that effect." Using the spare key Rosario unlocked a deadbolt lock and another lock in the doorknob. At this point Rosario "was just making a welfare check to make sure these people were all right." From the information he had been given he "assumed that something wasn't right." When asked why he did not knock on the door or ring the doorbell, Rosario testified: "Because I felt that no one had responded to the prior knocks on the door from the other two individuals."

Rosario opened the apartment door. There were no lights on in the apartment. With his feet outside the threshold, Rosario thrust his head through the open doorway, illuminated the interior with his flashlight, and shouted "San Jose Police Department" at least twice. While he was thus engaged he noticed a portable electric fan running in the living room. He also detected what he described as "a foul odor." He had smelled a similar odor on previous occasions when he had encountered dead people.

No response came from within. Rosario turned on a floor lamp next to the front door and entered the apartment, which proved to have a living room, dining area, bedroom, bathroom, and kitchen. Rosario passed through the living room into the dining area, and shined his flashlight into the bedroom. He saw nothing unusual. He saw a door, which was slightly open, in a hallway. Using his flashlight he pushed the door open and

illuminated the bathroom. The foul odor was stronger there. He moved toward the bathtub, which had a sliding shower door standing open three to five inches. With the butt of his flashlight he slid the shower door further open, and observed five or six blood-stained towels lying in the bathtub. He backed out of the bathroom, turned around in the hallway, and saw the dead body of Giovanni Macioce lying face up in a pool of blood in the kitchen. There were no visible wounds on the body.

Rosario made no further search. He left the apartment, closed the front door, and told the citizens and the manager what he had found. Then, using his portable radio, he contacted his immediate supervisor, Sergeant Arca. Arca arrived about 10 minutes later, obtained permission from the manager to reenter the apartment, and went inside with Rosario. Rosario pointed out Giovanni's body. Then, using the telephone in the apartment, Rosario summoned the night detectives.

Officer Ireland, one of three night detectives who responded to the call, received a telephone message at 12:16 a.m. and arrived at the Macioce apartment at 12:27 a.m. He checked the bedroom closet and a hallway closet for other bodies. In the hallway closet (which turned out to be a linen closet with shelves) he observed a bottle of rubbing alcohol with bloodstains on it. Ireland and another detective spent between 30 and 45 minutes inside the apartment, and took 17 photographs. Looking closely they observed that blood had been wiped up from an area of the kitchen floor adjacent to the body. At that point they decided a homicide had occurred, and they summoned the homicide investigators.

Officer Ronco, one of the investigators, received a call at 1:43 a.m. and arrived at the Macioce apartment at 2:05 a.m. He spent about 15 minutes inside the apartment looking around. It appeared to him that the body had been there "a day, possibly two." Drawers in bedroom dresser had been pulled out, and miscellaneous papers were strewn on the bedroom floor. The bed was not made; the sheets and other bedding had been pulled off. There were blood spatters in the hallway. To Ronco these signs indicated a struggle had taken place. He directed his assistants to search the premises for "things that were responsible for the crime and also leading to the disappearance and possible locating Mrs. Macioce, some of the items, papers, items."

Ronco testified that when the search began he was concerned for the safety of the missing wife. "I think what I was concerned with initially when I was there at the crime scene and several hours after that, that I was concerned for her safety, primarily. Where was she? I think I would be remiss in my job in not considering her as a suspect if she was alive. But my

first concern was: Was she alive. Had she been abducted. Had she met with some physical threat or was she being held. And that was my first concern at that point." When asked why he did not apply for a search warrant, Ronco testified: "At that time I was concerned with the exigent circumstances of the fact that Mrs. Macioce was not our primary suspect. In fact, she could be a possible victim at that point, and if we could locate evidence, things to lead us to her location and possibly rescue her from any harm, things—things that—inside the apartment that would allow us to do that I felt was a very important [thing] to do, and with that in mind that's why I went under that—took that tack, that guideline." "[I]f we had focused in on say, for instance, Mrs. Macioce as the suspect immediately at the scene, if there was something to link her I think it would have been in order to get a search warrant at that time. But under the circumstances with what I was faced with at the time I felt it was more important to forego that at that point so we could work as quickly as possible."

Ronco left the apartment and began interviewing other tenants in the complex. He obtained no useful information. At 4:10 a.m. he interviewed one of the citizens who had flagged down Officer Rosario. The citizen told Ronco that the Macioces had been having marital difficulties, and that other Jehovah's Witnesses had seen Mrs. Macioce alive either the previous Sunday or Monday, August 19-20. At that point Ronco began to think of the missing wife as a suspect.

Meanwhile, the searching officers took additional photographs and made notes. They seized nothing before the coroner arrived at 4:35 a.m. The coroner turned the body over, revealing a stab wound in Giovanni's back. After the corpse had been removed the officers began a systematic seizure of evidence. Some of the evidence was in plain view, or had come into plain view in Rosario's initial entry. For example, a checkbook and check register lay in plain view on top of a chest of drawers in the bedroom; and the bloody towels came into plain view when Rosario opened the shower doors in his search for persons. On the other hand, a pair of lady's denim trousers with bloodstains on the knees was found inside an opaque plastic bag in the bedroom closet. The murder weapon itself, a butcher knife, was discovered almost inadvertently. The officers were attempting to photograph a bloody fingerprint on the kitchen floor, trying to get the best angle and the best lighting. One of the officers happened to glance sideways, and spotted the butcher knife (bloody and encased in plastic) under the living room sofa.[2] The search and seizures concluded at 8:18 a.m. on Wednesday, August 22, 1984.

---

[2] Many of the items seized, including the murder weapon, were dusted for latent fingerprints, but no fingerprint expert testified at trial.

Later that same morning Officer Ronco communicated by telephone with two Jehovah's Witnesses who told him (a) that Mrs. Macioce had been alive the previous Sunday, and (b) that she had made a cash withdrawal from a branch of the Bank of the West in San Francisco the previous Monday. When he learned this Ronco began to focus on Mrs. Macioce as a suspect. He contacted the Bank of the West and inquired about activity in the Macioce checking account. A few days later the bank provided Ronco with cancelled checks and a video tape of Mrs. Macioce withdrawing funds from the account.[3] The checks revealed that Mrs. Macioce had made several purchases at a shopping mall on Saturday, August 18, 1984. In talking to sales clerks at various stores, Ronco discovered that the purchases were, in his words, "items of luggage, clothing, things that indicated to us that she was possibly going to go somewhere, use these items for some purpose. And they were all women's clothing, things that she could use." Based upon this and other information, Ronco filed a "felony affidavit" with the district attorney's office and requested a warrant for Mrs. Macioce's arrest.

On Sunday, August 26, before any warrant had issued for her arrest, Ronco learned that a Jehovah's Witness had received a telephone call from Macioce, and that Macioce had said she was in New York City. Ronco then telephoned the Witness, and instructed the Witness to have Macioce call him (Ronco) at the police department. About 9:30 p.m. Ronco received a telephone call from a woman who identified herself as Thereza Macioce. Ronco described the conversation thus: "She says she was sorry in what she did referring to the murder. And that she was also confused and she sounded depressed. And then started talking about turning herself in, what she should do, asking my advice. And then I requested that she just stand by where she was at the location. She identified that location—she was at the bus terminal in New York City which comes under the Port Authority of New York. And I contacted them, subsequently, and they took her into custody."

On September 6, 1984, Ronco flew to New York, took custody of Macioce, and returned with her to California. That evening, after being advised of her constitutional rights, Macioce gave a statement in which she admitted stabbing her husband.

## II.  ENTRY, SEARCH, AND SEIZURE

In superior court Macioce moved to exclude all evidence obtained as the result of the search of her apartment, including, but not limited to, police

---

[3] Ronco apparently secured these items from the bank without first obtaining a search warrant or a subpoena duces tecum. However: the point was not raised in the court below; it has not been addressed in the briefs on appeal; and no contention is made here that appellant's trial counsel was ineffective. We deem the point waived.

observations and photographs, the body, the murder weapon, the checkbook and register, the bloody towels, and the statement which she subsequently gave to the police. The court denied the motion. She renews her arguments here.

## A. *The Initial Entry*

█ Macioce first contends that Officer Rosario's initial entry was unlawful because he did not knock on the door or ring the doorbell. █ In serving either an arrest or a search warrant, police officers are required (a) to knock or utilize other means reasonably calculated to give adequate notice of their presence to the occupants, (b) to identify themselves as peace officers, and (c) to explain the purpose of their demand for admittance. (*Duke* v. *Superior Court* (1969) 1 Cal.3d 314, 319 [82 Cal.Rptr. 348, 461 P.2d 628].) The purposes and policies supporting the "knock-notice" rules are fourfold: (1) the protection of the privacy of the individual in his home; (2) the protection of innocent persons present on the premises; (3) the prevention of situations which are conducive to violent confrontations between the occupant and individuals who enter his home without proper notice; and (4) the protection of police who might be injured by a startled and fearful householder. (*Id.,* at p. 321.) "[T]he requirements for forcing entry to make an investigation should be no less stringent than they are where entry is made under a search warrant or for the purpose of arresting someone." (*People* v. *King* (1971) 5 Cal.3d 458, 464 [96 Cal.Rptr. 464, 487 P.2d 1032], fn. omitted.)

█ But strict technical compliance with "knock-notice" rules is not always required. The California Supreme Court has held: "When police procedures fail to conform to the precise demands of the [knock-notice] statute but nevertheless serve its policies we have deemed that there has been such substantial compliance that technical and, in the particular circumstances, insignificant defaults may be ignored." (*People* v. *Peterson* (1973) 9 Cal.3d 717, 723 [108 Cal.Rptr. 835, 511 P.2d 1187].) The substantial compliance exception has been held to excuse a technical trespass. (*People* v. *Patterson* (1979) 94 Cal.App.3d 456, 461 [156 Cal.Rptr. 518] [officer without warrant, feet partially in the residence, extended hand into residence to exhibit badge]; *In re William C.* (1977) 70 Cal.App.3d 570, 582 [138 Cal.Rptr. 843] [officer without warrant stepped in "slightly" to ascertain identity of juvenile].)

In addition there is the concept of excused noncompliance. *"Substantial compliance* with the knock and notice rule . . . is to be distinguished from *excused noncompliance.* The former can occur only when . . . there has been some attempt to comply. The latter can occur in cases wherein the

attempt to comply falls short of substantial compliance and also in cases . . . wherein there has been no attempt to comply." (*People* v. *Hall* (1971) 3 Cal.3d 992, 998, fn. 3 [92 Cal.Rptr. 304, 479 P.2d 664]; italics in original.)

Our nation's highest court has recognized the concept of excused noncompliance: "We do not question the right of the police to respond to emergency situations. ▮ Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408], fns. omitted.) A former Chief Justice of the United States, while sitting as a circuit court judge, wrote the following: "But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances' . . . e.g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within." (*Wayne* v. *United States* (D.C. Cir. 1963) 318 F.2d 205, 212, opn. of Burger, J., italics in original.)

With these principles in mind we examine the facts before us. The Macioces, normally regular attenders, missed a Jehovah's Witness meeting on Sunday. Giovanni Macioce missed scheduled knee surgery on Monday. On Sunday, Monday, and Tuesday two Jehovah's Witnesses made repeated attempts to contact the Macioces in person and by telephone, without success. The one and only Macioce automobile was parked in a carport. A large amount of mail rested in the mailbox. A note was affixed to the apartment door. About 20 minutes before they conversed with Officer Rosario, the two Jehovah's Witnesses had knocked on the apartment door and had received no response. The Witnesses asked Rosario for assistance. The

apartment manager had not seen the Macioces for a few days. Such was the information imparted to Rosario.

■ Given that information, we think Officer Rosario's conduct was eminently reasonable. It is true that when he unlocked the apartment door he committed a technical "breaking." (*Sabbath* v. *United States* (1968) 391 U.S. 585, 589-590, fn. 5 [20 L.Ed.2d 828, 833-834, 88 S.Ct. 1755].) But his failure to knock or to ring the doorbell was excused by the fact that repeated knocks on previous days, and a knocking just 20 minutes earlier, had proved unfruitful. Once the door was open Rosario crossed the threshold only with his head; his feet remained outside. He stated his identity and authority twice. His plain purpose was to elicit some response from within. Under the circumstances Rosario's conduct substantially complied with knock-notice requirements.

Once inside Rosario looked only for persons. When he found a corpse he stopped searching, left the apartment, and summoned his superior. The extent of his search was commensurate both with his stated motive and with the exigency. "[E]ntering the premises was the only practical means of determining whether there was anyone inside in need of assistance." (*People* v. *Hill* (1974) 12 Cal.3d 731, 755 [117 Cal.Rptr. 393, 528 P.2d 1], overruled on a different ground.)

We hold that Rosario's entry and limited search were lawful.

B. *Subsequent Entries And Searches*

■ Macioce next contends that the subsequent entries and searches made by the police were unlawful because they were accomplished without a search warrant. For this proposition she relies principally upon two decisions of the United States Supreme Court, which we now pause to examine.

In *Mincey* v. *Arizona, supra,* 437 U.S. 385 a narcotics officer, who earlier had arranged to purchase heroin from Mincey, approached Mincey's door accompanied by nine other officers and a county attorney. When the door was opened by an acquaintance of Mincey's, the narcotics officer rushed inside and into a bedroom. A rapid volley of shots ensued, and the narcotics officer emerged from the bedroom and collapsed on the floor. When other officers reached the bedroom they found Mincey lying on the floor, wounded and semiconscious. The officers then made a quick search for other victims. They found a wounded woman in a closet and three of Mincey's acquaintances in the living room. Emergency assistance was requested. Ten minutes later homicide detectives arrived. They supervised the removal of the suspects and the narcotics officer (who died a few hours later), and then

began a search of the premises which lasted four days. No warrant was ever obtained. Much of the evidence introduced against Mincey at trial was the product of the four-day search. Mincey was convicted of murder, assault, and narcotics charges.

The Arizona Supreme Court reversed the murder and assault convictions on state law grounds, but affirmed the narcotics convictions. The court did not hold that the search of Mincey's apartment fell within any of the recognized exceptions to the warrant requirement embedded in the Fourth Amendment; instead, it held that the search of a homicide scene should be recognized as an additional exception to that requirement.

The United States Supreme Court reversed and remanded. The high court held "that the 'murder scene exception' created by the Arizona Supreme Court is inconsistent with the Fourth and Fourteenth Amendments—that the warrantless search of Mincey's apartment was not constitutionaliy permissible simply because a homicide had recently occurred there." (*Mincey* v. *Arizona, supra,* 437 U.S. at p. 395 [57 L.Ed.2d at p. 302].) In a footnote the court added: "To what extent, if any, the evidence found in Mincey's apartment was permissibly seized under established Fourth Amendment standards will be for the Arizona courts to resolve on remand." (*Ibid,* fn. 9.)

In *Thompson* v. *Louisiana* (1984) 469 U.S. 17 [83 L.Ed.2d 246, 105 P.2d 409], Thompson's daughter called the local sheriff's office. According to the daughter, Thompson had shot her husband, then ingested a quantity of pills in a suicide attempt, and then, changing her mind, called her daughter, informed her of the situation, and requested help. Several deputies went to Thompson's home, entered the house, made a cursory search, and discovered Thompson's husband dead of a gunshot wound in a bedroom, and Thompson lying unconscious in another bedroom due to an apparent drug overdose. The deputies immediately transported Thompson to a hospital and secured the scene. About 35 minutes later two homicide investigators entered the house and conducted a search of the premises .which lasted two hours. Among other things they found a pistol in a chest of drawers, a torn-up note in a wastebasket, and a suicide note inside an envelope.

Thompson was indicted for the second degree murder of her husband. She moved to suppress the pistol and the two notes. The trial court granted her motion as to the pistol and the suicide note. The state applied for a writ of review. A sharply divided Louisiana Supreme Court held all of the evidence seized to be admissible. The court attempted to distinguish *Mincey* on the grounds (a) that the search of the Thompson home had lasted only two hours, and (b) that Thompson herself had requested medical assistance.

The United States Supreme Court reversed and remanded. As to the length of the search, the court held that "[a]lthough we agree that the scope of the intrusion was certainly greater in *Mincey* than here, nothing in *Mincey* turned on the length of time taken in the search or the date on which it was conducted. A 2-hour general search remains a significant intrusion on petitioner's privacy and therefore may only be conducted subject to the constraints—including the warrant requirement—of the Fourth Amendment." (*Thompson* v. *Louisiana, supra,* 469 U.S. at p. 21 [83 L.Ed.2d at p. 251].) As to Thompson's request for help, the court wrote this: "Petitioner's attempt to get medical assistance does not evidence a diminished expectation of privacy on her part. To be sure, this action would have justified the authorities in seizing evidence under the plain-view doctrine while they were in petitioner's house to offer her assistance. In addition, the same doctrine may justify seizure of evidence obtained in the limited 'victim-or-suspect' search discussed in *Mincey*. However, the evidence at issue here was not discovered in plain view while the police were assisting petitioner to the hospital, nor was it discovered during the 'victim-or-suspect' search that had been completed by the time the homicide investigators arrived. Petitioner's call for help can hardly be seen as an invitation to the general public that would have converted her home into the sort of public place for which no warrant to search would be necessary." (*Id*. at p. 22 [83 L.Ed.2d at pp. 251-252].)

The case before us is distinguishable from *Mincey* and *Thompson* in several particulars. First, we have no doubt that the body of Giovanni Macioce inevitably would have been discovered. The corpse was beginning to smell, and eventually would have attracted the attention of the neighbors. Ultimately the coroner would have been called by someone, and he would have been obliged by law to investigate the death. (Health & Saf. Code, §§ 10250, 10252; see *People* v. *Foster* (1980) 102 Cal.App.3d 882, 888-889 [warrantless entry of garage on report of dead body held illegal; but offensive odor would have led to inevitable discovery of the corpse].)

Second, unlike the situations in *Mincey* and *Thompson,* an exigency existed with regard to the whereabouts of Macioce herself. She was missing. The apartment appeared to have been ransacked. As Officer Ronco testified: "But my first concern was: Was she alive. Had she been abducted. Had she met with some physical threat or was she being held. And that was my first concern at that point." Although the superior court made no express finding on credibility, it evidently believed Ronco; in its ruling on the motion to suppress evidence the court said, among other things, this: "And when they did get inside and found the husband was killed, they had every reason to believe that the wife was in serious trouble. True, statistically, she might also have been the killer, but they didn't know that at the time. . . .

They had to get the checking account to find out the name on the account, contact friends and acquaintances that might be listed under various papers, . . . find out if the woman is a victim and/or perhaps in serious trouble, dead or injured or being held hostage or further being victimized, or find out if she's the culprit." ■ The credibility of Officer Ronco was entirely a question of fact, to be resolved by the trial court. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) ■ Exercising our independent judgment we conclude that a true exigency existed which made the search reasonable. (*Ibid.*)

Third, we reiterate that some of the evidence seized in this case was in plain view. *Mincey* itself points up the significance: "Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . *And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.*" (*Mincey* v. *Arizona, supra,* 437 U.S. at pp. 392-393 [57 L.Ed.2d at p. 300], italics ours.) Here the checkbook and register lay in plain view on top of a chest of drawers in the bedroom. Although those items were not contraband they were useful, in Officer Ronco's words, "in finding the person who abducted her and possibly causing her harm." Equipped with the checkbook and register the officers could have traced activity in the bank account; but they did not need those items to do so, because before contacting the bank they learned from Jehovah's Witnesses on the morning of August 23 that Mrs. Macioce had made a cash withdrawal from the San Francisco branch of Bank of the West.

Fourth, we note that most of the evidence seized from the apartment was not particularly incriminating. Bloody towels were taken, and the blood proved to be consistent with that of Giovanni Macioce; but the towels themselves provided no clue as to his killer. The murder weapon and several other items were dusted for latent fingerprints; but at trial no fingerprint expert testified. Photographs taken and diagrams made of the scene constituted no more than a memorialization of what the officers observed. True enough, a pair of lady's denim trousers was discovered with blood on the knees; but no prosecution witness testified that the trousers belonged to Macioce, or that they were her size, or that she laid claim to them. At trial Macioce claimed that she did the stabbing in self-defense, i.e., that her husband had beaten her in the past, that he threatened her with a knife and then dropped it, and that she then stabbed him because she was in fear of her life. Neither the towels, nor the murder weapon, nor the denim trousers, nor the checkbook nor register negated her claim of self-defense. Indeed, to the extent that police photographs showed evidence of a struggle, they supported Macioce's version of the facts.

Fifth, we cannot ignore the fact that Macioce admitted stabbing her husband, both in her pretrial statement and in her trial testimony. That admission eliminated all doubt as to the identity of the culprit, but it did not resolve questions as to whether the stabbing was justified. The evidence seized from the apartment shed no light on those questions.

We find no error in the admission of the seized evidence at trial. But if error there was, in view of Macioce's admissions it was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 972 [127 Cal.Rptr. 135, 544 P.2d 1335].)

## C. *Pretrial Statement*

■ Macioce further contends that her pretrial statement given to the police in San Jose was the product of the unlawful entry and search of her apartment. Her argument appears to run thus: the search of the apartment was unlawful; the unlawful search produced evidence which led to her arrest; therefore the arrest itself was unlawful, and her subsequent statement likewise. We find this argument difficult to accept.

First, nothing in the record before us shows that Macioce was made aware of the search of her apartment before she gave her statement. Second, if there was any illegality in the search of the apartment, we cannot perceive how that illegality tainted the voluntary telephone call Macioce made to Officer Ronco while she was in New York. Even if we assume that Macioce suspected the police had found Giovanni's body and had searched the apartment, we cannot believe that such suspicion prompted her to call the police. When she made that telephone call she was more than 3,000 miles away from San Jose, and could well have been on her way to Europe. The telephone call itself provided probable cause for arrest. Third, Macioce was fully advised of her constitutional rights before she gave her statement. Fourth, Macioce completely ignores the fact (which was established at trial) that when taken into custody by New York authorities she voluntarily told them "I am upset. I just killed my husband. He beat me, and I killed him."

In *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407] defendant Wong Sun was arrested without probable cause, arraigned before a commissioner, and released on his own recognizance. Several days later he voluntarily appeared in the office of a federal narcotics agent, and there gave an incriminating statement. The United States Supreme Court held that the statement was not the product of the illegal arrest. We quote from the opinion: "For Wong Sun's unsigned confession was not the fruit of that arrest, and was therefore properly admitted at trial.

On the evidence that Wong Sun had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, we hold that the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.'" (*Id.,* at p. 491 [9 L.Ed.2d at p. 457].)

*Wong Sun* is controlling. In this case we find no connection between any alleged impropriety in the search and the statements given by Macioce. Accordingly we hold that the statements were properly admitted in evidence.

## III. Jury Selection

In selecting the trial jury the prosecutor exercised six peremptory challenges and one challenge for cause. Four of the peremptory challeges, and the challenge for cause, were made to women. Out of the presence of the prospective jurors defense counsel twice objected to the prosecutor's use of peremptory challenges to exclude women. In each instance the prosecutor was asked to explain his reasons for the peremptory challenges, and he did so. In each instance the court concluded that the reasons given were valid. The trial began with a jury composed of nine men and three women. In the course of trial one male juror was excused, and his place was taken by a female alternate. The jury which ultimately decided the case consisted of eight men and four women.

It is Macioce's position that the prosecutor used his challenges systematically to exclude women, and particularly "battered women," from the jury. She relies principally on *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

In *Wheeler* two Black men were convicted of the murder of a White man. In the course of jury selection the prosecutor used peremptory challenges to strike every Black from the jury. In reversing the judgments the California Supreme Court said this: "We conclude that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. This does not mean that the members of such a group are immune from peremptory challenges; individual members thereof may still be struck on grounds of specific bias, as defined herein. Nor does it mean that a party will be entitled to a petit jury that proportionately represents every group in the community: we adhere to the long-settled rule that no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed

is composed of any particular individuals." (*Id.,* at pp. 276-277, fn. omitted.)

The court defined specific bias as "a bias relating to the particular case on trial or the parties or witnesses thereto." (*Id.,* at p. 276.) The opinion gave several examples of challenges for specific bias: "Thus, both blacks and whites may have prior arrests, both rich and poor may have been crime victims, both young and old may have relatives on the police force, both men and women may believe strongly in law and order, and members of any group whatever may alienate a party by 'bare looks and gestures.' " (*Ibid.*)

*Wheeler* did not specifically address the question of what constitutes a cognizable or identifiable class of persons. But in a later case the court, after quoting the foregoing passage from *Wheeler,* gave a clue: "Implicit in this list of examples is that persons previously arrested, crime victims, believers in law and order, etc. *are not identifiable groups whose representation is essential to a constitutional venire.*" (*People* v. *Fields* (1983) 35 Cal.3d 329, 348 [197 Cal.Rptr. 803, 673 P.2d 680], italics ours.)

The question of what *is* an "identifiable group" was addressed in *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595], which concerned disqualification of ex-felons and aliens from jury service. Two justices concurred in the lead opinion, two concurred in the result, and three justices dissented. In the lead opinion Justice Mosk wrote that there are two requirements which must be met "in order to qualify an asserted group as 'cognizable' for purposes of the representative cross-section rule. First, its members must share a common perspective arising from their life experience in the group, i.e., a perspective gained precisely *because* they are members of that group. It is not enough to find a characteristic possessed by some persons in the community but not by others; the characteristic must also impart to its possessors a common social or psychological outlook on human events." (*Id.,* at p. 98, italics in original.) Second, "[t]he party seeking to prove a violation of the representative cross-section rule must also show that no other members of the community are capable of adequately representing the perspective of the group assertedly excluded. This is so because the goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community *attitudes,* not of groups per se." (*Ibid.,* italics in original.) The opinion concluded that aliens and ex-felons are not cognizable groups, because it cannot be shown that no other members of the community adequately represent their particular viewpoints.

The lead opinion in *Rubio* was followed in *People* v. *Fields, supra,* 35 Cal.3d at p. 348, which held that persons who automatically would vote

against death at the penalty phase of a capital case, but profess impartiality at the guilt phase, are not a cognizable group. ■■ ■■ ■■ ■■ In *Fields* three justices concurred in the lead opinion, one concurred in the result, and three justices dissented.[4]

With the foregoing opinions in mind we return to the case before us. ■■ We concede, as we must, that women constitute a cognizable group. (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 531-533 [42 L.Ed.2d 690, 698-700, 95 S.Ct. 692]; *Ballard* v. *United States* (1946) 329 U.S. 187, 193-194 [91 L.Ed. 181, 185-186].) But in this case we reject the argument that women as a class were systematically excluded from the jury. The jury began with three women and nine men, and ended with four women and eight men. No law requires a petit jury to be composed of men and women in equal proportions.

■■ We also reject the argument that Macioce was denied a representative cross-section of the community because "battered women" were excluded from the jury. Battered women are victims of crime, and therefore are not a cognizable group "whose representation is essential to a constitutional venire." (*People* v. *Fields, supra,* 35 Cal.3d at p. 348.) Furthermore, no showing has been made that the viewpoints of battered women cannot adequately be represented by unbattered women. (*Rubio* v. *Superior Court, supra,* 24 Cal.3d at p. 98.) No one likes to be beaten; and in our view it is not necessary to have a previously beaten woman on a jury in order to preserve a community attitude against spouse beaters.

Finally, we note that of the four women excused on peremptory challenges, only two had actually experienced domestic violence. One of the two had been beaten by her ex-husband some 15 years previously, and had contemplated killing him with a knife; the other, when a teenager, had witnessed a physical altercation between her parents that ultimately led to a dissolution of their marriage. Of the remaining two, one had seen her husband commit suicide, and in court she expressed amazement over Macioce's age and gray hair; the other had had an unpleasant argument with the police over a traffic ticket. And one woman left *on* the jury had been hit in the eye by a drunken husband some years previously.

Accordingly we hold that Macioce was not denied a jury comprising a representative cross-section of the community.

---

[4] Neither the lead opinion in *Rubio* nor that in *Fields* constitutes a binding precedent on the reasons set forth therein. (9 Witkin, Cal. Procedure (3d ed. 1985) § 552, p. 540.)

## IV.  UNAVAILABLE WITNESS

At the preliminary hearing a witness named Virginia Gonzales testified for the prosecution. Gonzales was a Jehovah's Witness, and had known Macioce for over two years. Gonzales's testimony related principally to events that occurred on Friday, August 17, 1984, the day before Giovanni Macioce was killed. We summarize that testimony here.

On Friday morning Macioce telephoned Gonzales and said that her husband was no longer the same person, that he was seeing another woman. Gonzales drove over to the Macioce apartment. There Macioce related that her purse was missing. Her purse contained her identification card, her passport, and her credit cards, and all of her important papers; she feared that her husband Giovanni had taken them. Her keys to the apartment were also missing. She feared Giovanni might lock her out of the apartment. With a screwdriver Gonzales removed the deadbolt lock and chain lock from the apartment's front door. Macioce then accompanied Gonzales to the latter's house. Macioce exhibited a bruise on her left arm, and claimed that Giovanni had inflicted the bruise. Macioce said that her husband was romantically interested in a woman named Gina, who was heavy, ugly, very dirty-looking, and who used filthy language. Macioce feared her husband would return to Sardinia. She also feared that her husband was taking drugs. Gonzales suggested that Macioce should withdraw money from the bank. Macioce responded that she would wait to do that, since Giovanni was going to get a paycheck that same day. Giovanni picked his wife up about 3:30 p.m. that day.

The foregoing evidence apparently was elicited in an effort to show that the killing of Giovanni was premeditated. It was the prosecution's theory that Macioce purposefully laid a foundation for the disappearance of her husband. The prosecutor said in his summation: "Then why does Thereza tell these things to her friends? And one explanation of that later on you can relate to other evidence of her intentions is that she was laying the ground work for people to believe that Giovanni was going to be gone and be gone very soon; that at any time he might leave her."

Gonzales testified at the preliminary hearing on November 14, 1984. In December of 1984 Gonzales became a patient of Dr. Mary Defigard, a physician in family practice. According to Dr. Defigard, Gonzales exhibited symptoms of extreme stress, including absence of menstruation, water retention, acne, hair loss, chronic gastritis, and hyperventilation syndrome. Gonzales became "suicidal one night and had to be admitted to the hospital because she felt that that was her only way out of her situation with

knowing that she'd be, you know, faced with this trial situation." Thereafter Defigard saw Gonzales in five office visits. Gonzales's symptoms improved.

Macioce's trial began on June 25, 1985. On July 9, 1985, Gonzales appeared at trial but did not testify. She apparently asserted that testifying again would impair both her physical and mental health. She was in the hallway outside the courtroom, crying. To determine whether Gonzales was truly "unavailable" as a witness (Evid. Code, § 240, subd. (c)), the court called Dr. Defigard as its own witness, and allowed counsel for both sides to cross-examine her. On direct examination the court asked Dr. Defigard if she had an opinion, based upon reasonable medical certainty, that it would be harmful to Gonzales's health if she were called again as a witness. Dr. Defigard replied, "Um, yes. To the best of my knowledge it would be harmful for her to testify." She also testified that Gonzales was not malingering. On cross-examination Dr. Defigard (1) admitted that Gonzales's symptoms had improved over time, and (2) testified that while Gonzales might suffer no reaction at all from testifying, "there's maybe a seventy percent chance that it could—that it would be detrimental to her."

The court expressed concern for Macioce's right of confrontation, and noted that "I personally find it hard to understand why a mature, adult person faced with all the variety of stress that we meet every day in urban life, crowded society, why suddenly this one demand placed on her has caused such stress, such an hysterical reaction." But the court ruled that "I'm satisfied from Dr. Defigard's testimony that there's a clear and present danger that requiring this lady to testify would cause her present and future mental and physical harm. And under the Code, I believe that I'm obliged to find that the witness is unavailable and that I can't—it would be improper for me to make—find judgments on how important her testimony is in deciding how much danger to her health we're willing to tolerate. . . . So at this time, I'll rule that she's unavailable, and that her preliminary examination testimony can be read back."

█ Macioce now contends the trial court abused its discretion in finding Gonzales unavailable as a witness, and thereby deprived Macioce of her right to confront and cross-examine Gonzales. For this proposition she cites a number of cases which antedate subdivision (c) of Evidence Code section 240. We endeavor to place that subdivision in perspective.

Subdivision (a), paragraph (3), of Evidence Code section 240 provides that a witness is unavailable if [s]he is "[d]ead or unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity." Subdivision (c) of the same section was enacted in 1984, and in pertinent part it reads as follows: "Expert testimony which establishes that

physical or mental trauma resulting from an alleged crime has caused harm to a witness of sufficient severity that the witness is physically unable to testify or is unable to testify without suffering substantial trauma may constitute a sufficient showing of unavailability pursuant to paragraph (3) of subdivision (a). As used in this section, the term 'expert' means a physician and surgeon, including a psychiatrist . . . ."

In this case there was substantial evidence from which the trial court could reasonably have concluded that Gonzales was "unable to testify without suffering substantial trauma." Accordingly we find no abuse of the trial court's discretion.

But even if the trial court *did* abuse its discretion—a point which we do not concede—we would nevertheless deem the error harmless, for two reasons. First, the testimony provided by Gonzales was in many respects cumulative to testimony provided by other witnesses. Second, to the extent that her testimony suggested premeditation on the part of Macioce—again, a point we do not accept—the jury obviously disregarded that testimony when it found Macioce guilty of second degree murder instead of first degree murder. Consequently if error there was, Macioce suffered no prejudice from the admission of Gonzales's preliminary hearing testimony.

Therefore the judgment is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 20, 1988.