[No. G022376. Fourth Dist., Div. Three. Jan. 31, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
CANO GARCIA, Defendant and Appellant.

## COUNSEL

Michael Satris, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Carl Horst and Craig S. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, J.**—Cano Garcia was charged with burglary. During his trial, it somehow became known that two members of the jury venire were lesbians. In fact, they both worked for the same gay and lesbian foundation. After the prosecution excused both women, defense counsel made a *Wheeler* motion.[1] There was a discussion at the bench, and the trial court denied the motion, explaining, "Well, I am going to rule that sexual preference is not a cognizable group . . . . I don't think that your sexual preference specifically relates to them sharing a common perspective or common social or psychological outlook on human events. [¶] Lesbians or gay men vary in their social and psychological outlook on human events and I don't think fit into this protection. So I'm going to deny your motion." This is Garcia's sole assignment of error.

In 1986, the United States Supreme Court decided *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69], holding that the equal protection clause of the United States Constitution prohibits jury selection based upon racial stereotyping. Eight years later, it decided *J. E. B. v. Alabama ex rel. T. B.* (1994) 511 U.S. 127 [114 S.Ct. 1419, 128 L.Ed.2d 89], extending the rationale of *Batson* to gender discrimination. To date, those are the only two classifications the Supreme Court has recognized as prohibited bases for exclusion of jurors under the equal protection clause. It has not yet

---

[1]*People v. Wheeler* (1978) 22 Cal.3d. 258 [148 Cal.Rptr. 890, 583 P.2d 748] prohibits exclusion of jurors based upon race, ethnicity, gender or "similar" group bias.

dealt with an equal protection challenge which did not involve the "strict" or "heightened" scrutiny applied to race- and gender-based classifications of all sorts (see *Reed v. Reed* (1971) 404 U.S. 71 [92 S.Ct. 251, 30 L.Ed.2d 225]; *Personnel Administrator of Mass. v. Feeney* (1979) 442 U.S. 256 [99 S.Ct. 2282, 60 L.Ed.2d 870]), so it has not yet been established whether such scrutiny is a sine qua non of *Batson* error or merely a common characteristic.

Other courts have struggled with classifications as diverse as religion, age, socio-economic status, union membership and obesity—with varying degrees of success. But in this case we have reached territory which, 13 years after *Batson* and more than two decades after its California predecessor (*People v. Wheeler, supra*, 22 Cal.3d 258), is still terra incognita: sexual orientation.[2]

The terrain before us is as stark as a moonscape and without discernible footprints: Our only issue is whether lesbians—and presumably gay males—constitute a cognizable class whose exclusion resulted in a jury that failed to represent a cross section of the community and thereby violated Garcia's constitutional rights. For reasons we explain here, we are convinced they do. We are convinced they *must*. But we recognize the fact the court's ruling obviated the prosecution's defense of its peremptories, so we remand the case for a determination by the trial court whether the prosecution's challenges had valid constitutional bases.

Federal authority is sparse on this issue. It was raised in the Ninth Circuit in *Johnson v. Campbell* (9th Cir. 1996) 92 F.3d 951, but the record was so insubstantial the court chose to assume that sexual orientation was a cognizable class yet reject the appeal because it could not be shown that there was purposeful discrimination. In that case, plaintiff's counsel in a civil rights litigation objected to the use of a peremptory challenge by defense counsel against a prospective juror. Plaintiff's counsel asserted he could tell the prospective juror was gay based on, inter alia, "affect" and "mannerisms," and he thought that was why his opponent had exercised a peremptory challenge. He asked the trial judge to inquire into the prospective juror's sexual orientation so as to determine whether a *Batson* motion was called for. The trial court declined, and the Ninth Circuit affirmed, holding that even assuming sexual orientation to be a prohibited basis for peremptory

---

[2]"Trial courts confronted with the question of whether jurors may be asked their sexual orientations during voir dire have not responded consistently. Moreover, no appellate court has ruled on this question or on the constitutional treatment of challenges for cause or peremptory challenges to exclude prospective jurors based on sexual orientation. These issues remain unresolved at a point when an increasing number of cases involving sexual orientation reach juries, and the number of such cases will continue to grow." (Lynd, *Juror Sexual Orientation: The Fair Cross-Section Requirement, Privacy, Challenges for Cause, and Peremptories* (1998) 46 UCLA L.Rev. 231, 235.)

challenges, and even assuming it could be shown the individual juror was gay, the record was insufficient to suggest the challenge had been based upon purposeful discrimination.

But other than this case, we find nothing discussing the issue in all of federal authority. Which is not surprising. This is not an issue which comes up in the course of ordinary—or even extraordinary—voir dire. Sexual orientation is not something likely to be volunteered, either by heterosexuals or homosexuals, and it is even less likely to be the subject of inquiry by court or counsel. We regret that our record in this case does not clearly reveal how it came up here. But it has come up, and it is our obligation to determine its import in this case of first impression.

As noted, most federal jurisprudence in this area deals with equal protection of the laws and the application of that guarantee to state and local governments through the Fourteenth Amendment. In *Batson*, the Supreme Court held that exclusion of Black jurors on the basis of their race violated the Fourteenth Amendment's guarantee of equal protection of the laws. It based its decision on earlier cases in which it had held that equal protection (*Strauder v. West Virginia* (1880) 100 U.S. 303 [25 L.Ed. 664]) and due process (*Duncan v. Louisiana* (1968) 391 U.S. 145 [88 S.Ct. 1444, 20 L.Ed.2d 491]) required that a criminal jury be drawn from the community and selected by nondiscriminatory criteria. (*Batson v. Kentucky, supra,* 476 U. S. at pp. 83, 85-86 [106 S.Ct. at pp. 1715-1717].) *Batson* provided that to establish a case of impermissible exclusion for equal protection purposes, the defendant must show that he was a member of a "cognizable racial group," and that the prosecution had systematically excluded members of that group from the jury venire. (*Id.* at p. 96 [106 S.Ct. at p. 1723].) The court's idea of what would qualify a group as cognizable is indicated by its citation to its earlier decision in *Castaneda v. Partida* (1977) 430 U.S. 482, 494 [97 S.Ct. 1272, 1280, 51 L.Ed.2d 498], in which it defined a cognizable group as "one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied."

In 1994, the Supreme Court arrived at the same conclusion with regard to exclusion of women from jury panels. By the time that case, *J. E. B. v. Alabama ex rel. T. B., supra,* 511 U.S. 127, reached it, the court had dealt with several racial exclusion cases and had fleshed out the *Batson* opinion somewhat. It said, "We have recognized that whether the trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." (*Id.* at p. 128 [114 S.Ct. at p. 1421].) Applying this principle, and the "heightened scrutiny

afforded distinctions based on gender" (*id.* at p. 135 [114 S.Ct. at p. 1425]), the court held that equal protection prohibited the exclusion of women from juries on the basis of their gender, that "gender, like race, is an unconstitutional proxy for juror competence and impartiality." (*Id.* at p. 129 [114 S.Ct. at p. 1422].)

But before those two cases, the Supreme Court decided *Taylor v. Louisiana* (1975) 419 U.S. 522 [95 S.Ct. 692, 42 L.Ed.2d 690], in which it did not base its decision on the equal protection clause at all, but instead held that the Sixth Amendment's guarantee of a jury venire representative of the community prohibited exclusion of women from such venires based upon their gender. *Taylor* was the culmination of the line of decisions upon which the California Supreme Court based its decision in *People v. Wheeler.* ██ And it is this guarantee, rooted in the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution, upon which we base our decision in this case.[3]

Billy J. Taylor was convicted under a Louisiana system of jury selection which provided that no woman would be called for jury service unless she had first submitted a written declaration of her desire to serve. It was stipulated that under that system, women made up fewer than 10 percent of the jury venires in the parish at issue, although they represented 53 percent of its population. Taylor's jury venire of 175 included no women.

The Supreme Court held, "The unmistakable import of this Court's opinions . . . is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial" (*Taylor v. Louisiana, supra,* 419 U.S. at p. 528 [95 S.Ct. at p. 697]), and that the systematic exclusion of women from the jury venire violated that right. It said: "The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. [Citation.] This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with

---

[3]"In our recent decision in *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], we held that in state criminal prosecutions the right to trial by a jury drawn from a 'representative cross-section of the community' is guaranteed equally and independently by the Sixth Amendment to the federal Constitution and by article I, section 16, of the California Constitution, and that such right is violated when a 'cognizable group' within the community is systematically excluded from jury service." (*Rubio v. Superior Court* (1979) 24 Cal.3d 93, 97 [154 Cal.Rptr. 734, 593 P.2d 595].)

our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. 'Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case. . . . [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.' " (*Id.* at pp. 530-531 [95 S.Ct. at p. 698], quoting from Justice Frankfurter's dissent in *Thiel v. Southern Pacific Co.* (1946) 328 U.S. 217, 227 [66 S.Ct. 984, 989, 90 L.Ed. 1181, 166 A.L.R. 1412].)

This was the reasoning which informed the California Supreme Court's decision in *People v. Wheeler*. After reviewing the line of cases which led to *Taylor*, and after quoting the section set out above, the court said, "We have reviewed this line of United States Supreme Court opinions in some detail because we fully agree with the views there expressed as to the importance of the representative cross-section rule, particularly in protecting the constitutional right to an impartial jury." (*People v. Wheeler, supra*, 22 Cal.3d at p. 270.) ■■■ California courts have since struggled mightily with this constitutional promise, and our Supreme Court has provided sufficient analytical framework to enable us to say with some certainty that exclusion of lesbians and gay men on the basis of group bias violates the California Constitution.

The pivot of our analysis is the definition of the term, "cognizable group." In *Rubio v. Superior Court, supra*, 24 Cal.3d 93, our Supreme Court, working from *Wheeler*, held that the right under the California Constitution to a jury drawn from a " 'representative cross-section of the community' " is violated whenever a " 'cognizable group' " within that community is systematically excluded from the jury venire. (*Rubio* at p. 97.)[4] ■■■ It explained that, "Two requirements must thus be met in order to qualify an asserted group as 'cognizable' for purposes of the representative cross-section rule. First, its

[4]*Rubio* is often referred to as a plurality opinion. And in fact, it was. The lead opinion, from which we quote, was penned by Justice Mosk, and signed only by him and Justice Manuel (Justices Clark and Richardson concurred in the judgment, providing the majority). Indeed, Justice Mosk himself has, with characteristic restraint, noted that it is "uncertain . . . whether [*Rubio*] reflect[s] the views of a majority of the justices supporting the judgment . . . ." (*Amway Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1267-1268 [48 Cal.Rptr.2d 12, 906 P.2d 1112], and fn. 1 (conc. opn. of Mosk, J.).) But we take that comment to refer only to the limited assent of Justices Clark and Richardson. The three dissenting justices, Bird, Newman, and Tobriner, had no quarrel with Justice Mosk's definition of "cognizability" but rather objected that the opinion took too narrow a view in allowing for the idea that groups other than those excluded from jury service—groups with similar characteristics—could represent the groups excluded, thereby curing the constitutional error. A close reading of the dissenting

members must share a common perspective arising from their life experience in the group, i.e., a perspective gained precisely *because* they are members of that group. It is not enough to find a characteristic possessed by some persons in the community but not by others; the characteristic must also impart to its possessors a common social or psychological outlook on human events. For example, in *Adams* [v. *Superior Court* (1974) 12 Cal.3d 55 [115 Cal.Rptr. 247, 524 P.2d 375]] the claimed cognizable group was composed of all persons who had resided in the community for less than one year; at any given moment the members of that group could be identified with certainty and thereby distinguished from all other persons in the community, but a majority of this court held that they had not acquired a true 'commonality of interest' merely by virtue of the brevity of their residence." (*Id.* at p. 98.)

 Lesbians and gay men qualify under this standard. It cannot seriously be argued in this era of "don't ask; don't tell" that homosexuals do not have a common perspective—"a common social or psychological outlook on human events"—based upon their membership in that community. They share a history of persecution comparable to that of Blacks and women. While there is room to argue about degree, based upon their number and the relative indiscernibility of their membership in the group, it is just that: an argument about degree. It is a matter of quantity, not quality.

This is not to say that all homosexuals see the world alike. The Attorney General here derides the cognizability of this class with the rhetorical question, "[W]hat 'common perspective' is, or was, shared by Rep. Jim Kolbe (R-Ariz.), RuPaul, poet William Alexander Percy, Truman Capote, and Ellen DeGeneres?" He confuses "common perspective" with "common personality." Granted, the five persons he mentions are people of diverse backgrounds and life experiences. But they certainly share the common perspective of having spent their lives in a sexual minority, either exposed to or fearful of persecution and discrimination. That perspective deserves representation in the jury venire, and people who share that perspective deserve to bear their share of the burdens and benefits of citizenship, including jury service.

---

opinions of Justices Tobriner and Newman turns up not a word of complaint about the lead opinion's "cognizability" definition. It appears to us there were five votes for that point.

The *Rubio* lead opinion was adopted in *People v. Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680]. *Fields*, too, is a plurality opinion. Nonetheless, *Rubio* has never been reconsidered, is still cited on this point with approval by the California Supreme Court (see, e.g., *People v. Beeler* (1995) 9 Cal.4th 953, 998 [39 Cal.Rptr.2d 607, 891 P.2d 153]), and has been frequently cited by courts impressed as we are by its scholarship, reason, and common sense. (See, e.g., *People v. McCoy* (1995) 40 Cal.App.4th 778, 783 [47 Cal.Rptr.2d 599]; *People v. Cervantes* (1991) 233 Cal.App.3d 323, 334 [284 Cal.Rptr. 410]; *People v. Macioce* (1987) 197 Cal.App.3d 262, 279-280 [242 Cal.Rptr. 771].) Our confidence in the opinion is apparently shared by the Attorney General, whose brief adopts its definitions as the standard for cognizability.

The Attorney General also insists "there is no evidence that gays or lesbians have a common social or psychological outlook on human events." But this misperceives the nature of the term "common perspective." Commonality of perspective does not result in identity of opinion. That is the whole reason exclusion based upon group bias is anathema. It stereotypes. It assumes all people with the same life experience will, given a set of facts, reach the same result.[5]

A common perspective does no such thing. It affects how life experiences are seen, not how they are evaluated. And inclusion of a cognizable group in the jury venire does not assure any particular position; it assures only that the facts will be viewed from a variety of angles. It assures that as many different life views as possible will be represented in the important decisions of the judicial process. Put more elegantly, "[T]he goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community attitudes, not of groups per se." (*Rubio v. Superior Court, supra,* 24 Cal.3d at p. 98.)

The importance of this was aptly described by the United States Supreme Court: "[T]he exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases. . . . [¶] . . . When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." (*Peters v. Kiff* (1972) 407 U.S. 493, 503-504 [92 S.Ct. 2163, 2169, 33 L.Ed.2d 83], fn. omitted.) The Attorney General misapprehends the nature of this critical consideration in arguing that there is no evidence of a gay or lesbian "common psychological outlook."

Indeed, the Attorney General in this case takes the same position taken by his office—unsuccessfully—in *Rubio.* As described then, "The Attorney General contends, however, that [the] group [does not qualify] because it is heterogeneous in all other respects: its membership cuts across racial, religious, sexual, economic, social, and occupational lines. The argument is

---

[5]"A party may not use peremptory challenges to remove prospective jurors solely on the basis of group bias. Group bias is a presumption that jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*People v. Fuentes* (1991) 54 Cal.3d 707, 713 [286 Cal.Rptr. 792, 818 P.2d 75], citing *People v. Wheeler, supra,* 22 Cal.3d 258.)

fallacious, and proves too much: it could equally well be applied to the women excluded in *Taylor* v. *Louisiana* . . . , the blacks excluded in *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163], and our decision in *Wheeler*, and the daily wage earners excluded in *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 118, 66 S.Ct. 984, 166 A.L.R. 1412]. In each case the group was likewise heterogeneous in all respects save one— but that one, as here, imparted to its members a shared viewpoint that could not be excluded from the master jury list without impairing its representativeness. Indeed, the Attorney General's contention has already been refuted in *Wheeler*: in suggesting ways in which a party may prove that prospective jurors are being removed because of their group association, we said it may be shown that such jurors 'share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole.' (22 Cal.3d at p. 280.)" (*Rubio v. Superior Court*, *supra*, 24 Cal.3d at p. 99.) The argument failed to convince the Supreme Court 20 years ago, and it fails to convince us now.

■ There is a second prong to the *Rubio* test for cognizability—the one that fractured the majority in that case: "The party seeking to prove a violation of the representative cross-section rule must also show that no other members of the community are capable of adequately representing the perspective of the group assertedly excluded. This is so because the goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community attitudes, not of groups per se. When a 'cognizable group' is defined too narrowly, it may duplicate another group in the community with a similar experience and viewpoint." (*Rubio v. Superior Court*, *supra*, 24 Cal.3d at p. 98, italics omitted.)

■ The question, then, is whether another group—or groups—in the community could adequately represent the views of homosexuals. We don't see how.

In *Rubio*, the issue was exclusion of felons[6] and resident aliens. The court pointed out that to the extent felons have a different perspective on life, it is legally indistinguishable from that of misdemeanants who have served jail time, or citizens who have been committed to a facility like the California Youth Authority, or been involuntarily committed. The court dealt with the complaints of resident aliens in the same way, pointing out that all naturalized citizens were, for at least five years, resident aliens, and suffered the

---

[6]The *Rubio* court, as do many others, called them "ex-felons." We note that the United States Supreme Court usage seems to be merely "felons." We think it to be a usage like "flammable" and "inflammable": two words that look quite different—but mean the same thing.

same disabilities and discrimination; their perspectives could therefore adequately represent those of resident aliens.

But we cannot think of anyone who shares the perspective of the homosexual community. Outside of racial and religious minorities, we can think of no group which has suffered such "pernicious and sustained hostility" (*Rowland v. Mad River Local Sch. Dist.* (1985) 470 U.S. 1009, 1014 [105 S.Ct. 1373, 1377, 84 L.Ed.2d 392] (dis. opn. of Brennan, J.) [dissenting from denial of certiorari]), and such "immediate and severe opprobrium" (*ibid.*) as homosexuals.[7] Certainly the Attorney General has suggested no one, and our search of case law and other literature has turned up no intimation of a group with their perspective. Both the defendant and the community are entitled to have that perspective represented in the jury venire.

We emphasize the fact that the community has an interest even greater than—albeit not as immediate as—the defendant's. While injustice to any individual is intolerable under our system of justice, and denial of the rights of a cognizable group is unconstitutional, in the long run, the greatest threat of failure to guarantee the right of gays and lesbians to serve on juries is to the commonweal. "The diverse and representative character of the jury must be maintained ' "partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility." ' " (*J. E. B. v. Alabama ex rel. T. B., supra,* 511 U.S. 127, 134 [114 S.Ct. at p. 1424], quoting *Taylor v. Louisiana, supra,* 419 U.S. at pp. 530-531 [92 S.Ct. at pp. 697-698].) If we deny that civic responsibility to any group, if we deny them the " 'privilege of participating equally . . . in the administration of justice,' " (*Peters v. Kiff, supra,* 407 U.S. at p. 499 [92 S.Ct. 2163, 2167], quoting *Strauder v. West Virginia, supra,* 100 U.S. 303, 308-309 [25 L.Ed. 664, 666]) we deprive them of part of their membership in the community, and while that has an immediate impact on the excluded group, it must inevitably damage the community as well. "Jury service is an important educational experience for the citizen. It encourages the development of civic responsibility as well as an interest in, and respect for, the law and its enforcement." (*People v. Marr* (1971) 67 Misc.2d 113 [324 N.Y.S.2d 608, 615].) It is not just the excluded group, but the entire community that suffers when these values are not fostered.

The Attorney General complains that it is impractical to recognize gays and lesbians as a cognizable group. As he points out, sexual orientation is

---

[7] A November 1998 poll by the National Law Journal found that 17.1 percent of prospective jurors *admitted to* a bias which would make it impossible for them to be fair and impartial in a case in which one of the parties was homosexual. By comparison, only 4.8 percent did not think they could be fair to African-Americans, and 5 percent did not think they could be fair to women. (Nat. L.J. (Nov. 2, 1998) p. A1.)

"not necessarily patent, nor a public matter a prospective juror should be required to declare." We acknowledge both those facts. But neither affects our decision.

Race and ethnicity are not necessarily patent, either. While gross estimations of race can be made on the basis of physical appearances, such judgments are entirely subjective and often erroneous. And ethnicity has become virtually impossible to judge without inquiry. Our jury venires daily include Cubans named O'Rourke, Indonesians named Opdyke, and Anglos named Gomes. Every trial judge has encountered red-haired, freckle-faced Cardenases and Hispanic-looking Maguires. The country is a melting pot— and proud of it—and a large part of the great folly of stereotyping is that nowhere on earth have race and ethnicity become harder to determine than they are here. Yet the propriety of *those* criteria for cognizable groups is unassailable. Sexual orientation will present no greater difficulty.

Nor do we perceive a great problem lurking with regard to inquiring of jurors about their sexual orientation. It simply should not be done. The Attorney General is right in this regard: No one should be "outed" in order to take part in the civic enterprise which is jury duty. The whole point is that no one can be excluded because of sexual orientation. That being the case, no one should be allowed to inquire about it. If it comes out somehow, as it did here, the parties will doubtless factor it into their jury selection decisions, just as they factor in occupation, education, body language, and whether the juror resembles their stupid Uncle Cletus. But there is no reason to allow inquiry about it.

We are also aware of the argument that gays and lesbians may not be a big enough group to be cognizable. This concern is based upon the perception that perhaps the *Fields* court expanded somewhat on *Rubio*'s definition of a cognizable class when it noted that, "It is clear that the groups recognized as cognizable classes are generally *relatively large* and well defined groups in the community whose members may, because of common background or experience, share a distinctive viewpoint on matters of current concern." (*People v. Fields, supra,* 35 Cal.3d at p. 349, italics added.) Our record does not reflect the size of the homosexual community,[8] and the question can be raised whether it is "large" as *Fields* meant that term.

But the *Fields* reference to a "large" group is one of relative numbers rather than absolute ones. *Fields* describes size as a typical attribute of

[8]Most reliable estimates seem to arrive at a number between 1-10 percent of the population. (Compare J. of Human Sexuality (Rekers ed. 1996) pp. 66-69 [1-2 percent], Laumann et al., The Social Organization of Sexuality: Sexual Practices in the United States (Univ. Chi. Press 1994) [1.5 percent women; 2.8 percent men], with the dated, but still often quoted Kinsey et al. study (1948) [10 percent].)

cognizable groups, not a requirement; it says they are *"generally"* *"relatively"* large. (*People v. Fields, supra*, 35 Cal.3d at p. 349, italics added.) It is simply not possible to read that as a requirement of any particular threshold size. We are confident both the *Fields* court and the Attorney General would recoil from support of a prosecutor who excused prospective jurors on the sole basis they were Unitarian or Ainu. No one suggests either of these groups outnumbers gays and lesbians in California, but no one would question their cognizability.[9]

In fine, gays and lesbians seem to meet the criteria for a cognizable group.[10] We see no reason in the objections raised by the Attorney General not to acknowledge that status, and nothing in law or logic which would enable us to come to a different conclusion.

That group cannot be discriminated against in jury selection. For such discrimination would send an intolerable message, one which the United States Supreme Court has eloquently described: "The message it sends to all those in the courtroom, and all those who may later learn of the discriminatory act, is that certain individuals, for no reason other than [sexual orientation], are presumed unqualified by state actors to decide important questions upon which reasonable persons could disagree." (*J. E. B. v. Alabama ex rel. T. B., supra*, 511 U.S. at p. 142 [114 S.Ct. at p. 1428].) We will not send that message.

But this does not end our inquiry. The Attorney General urges us, should we decide as we have, to remand the matter to the trial court for a hearing

---

[9]While it is clearly too late in the day to argue that one could be excused from a jury on the basis of Ainu heritage, the Attorney General argues that California case law *has* allowed the exercise of a peremptory challenge based upon a prospective juror's religion, citing *People v. Martin* (1998) 64 Cal.App.4th 378 [75 Cal.Rptr.2d 147] and footnote 3 in *People v. Johnson* (1989) 47 Cal.3d 1194, 1217 [255 Cal.Rptr. 569, 767 P.2d 1047]. But *Martin* explicitly limited itself to a juror whose religious beliefs would interfere with service as a juror ("The prosecutor's perception that the juror's religious views might render her uncomfortable with sitting in judgment of a fellow human being was a specific bias related to the individual juror's suitability for jury service.") (*People v. Martin, supra*, 64 Cal.App.4th 378, 384.) Nothing suggests sexual orientation could result in a specific bias in the burglary case before us here. And the *Johnson* footnote was merely a passing observation in dicta that the perimeters of the then relatively new *Batson* decision had not yet been defined in such a way as to make it clear that federal law would bar exclusion on the basis of religion. Neither case suggests the California Constitution would allow exclusion on that basis.

[10]Certainly they have been found entitled to protection from group bias in other contexts. "The decisions hold the Unruh [Civil Rights] Act [(Civ. Code, § 51)] forbids discrimination against individuals on the basis of sexual orientation. (E.g., *Rolon v. Kulwitzky* (1984) 153 Cal.App.3d 289, 292 [200 Cal.Rptr. 217]; . . . *Hubert v. Williams* (1982) 133 Cal.App.3d Supp. 1, 5 [184 Cal.Rptr. 161]; see also *Stoumen v. Reilly* (1951) 37 Cal.2d 713, 716-717 [234 P.2d 969]." (*Beaty v. Truck Ins. Exchange* (1992) 6 Cal.App.4th 1455, 1460 [8 Cal.Rptr.2d 593]. The California Supreme Court has explicitly confirmed this protection. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1155 [278 Cal.Rptr. 614, 805 P.2d 873].)

providing the prosecutor an opportunity to explain his challenges. He points out this was the procedure followed in *Batson v. Kentucky*, and it has been adopted by the Fifth District Court of Appeal in *People v. Rodriguez* (1996) 50 Cal.App.4th 1013, 1024-1025 [58 Cal.Rptr.2d 108], *People v. Tapia* (1994) 25 Cal.App.4th 984, 1031 [30 Cal.Rptr.2d 851], and *People v. Gore* (1993) 18 Cal.App.4th 692, 706 [22 Cal.Rptr.2d 435]. It is also a procedure followed in several other jurisdictions. (See, e.g., *Saadiq v. State* (Iowa 1986) 387 N.W.2d 315; *Chew v. State* (1989) 317 Md. 233 [562 A.2d 1270]; *State v. Nathan* (Mo. 1999) 992 S.W.2d 908; *Middleton v. Beckett* (Colo.Ct.App. 1998) 960 P.2d 1213.)

In many—perhaps most—cases, it will be " 'unrealistic to believe that the prosecutor could now recall in greater detail his reasons for the exercise of the peremptory challenges in issue, or that the trial judge could assess those reasons, as required, which would demand that he recall the circumstances of the case, and the manner in which the prosecutor examined the venire and exercised his other challenges.' " (*People v. Snow* (1987) 44 Cal.3d 216, 227 [242 Cal.Rptr. 477, 746 P.2d 452], quoting *People v. Hall* (1983) 35 Cal.3d 161, 171 [197 Cal.Rptr. 71, 672 P.2d 854].) This is likely one of those cases. This was—although we abhor the societal norm suggested by the term—a garden-variety burglary case, which was tried two and one-half years ago.[11] There was nothing unusual about the case other than the voir dire. While we have every confidence in the good faith and professionalism of the parties, we have less confidence in their memories. It may be that the passage of time has made it impossible for the prosecutor to recall the grounds of his challenges and the court to intelligently evaluate those grounds.

But it is also possible that the issue which arose in voir dire was so unusual that the parties will be able to conduct a hearing in which the court can appraise the reasons offered by the prosecutor for excusing the two jurors and make a decision whether Garcia's constitutional rights were violated, based upon the principles we have discussed above. The matter is therefore remanded to allow the trial court to conduct a hearing to determine the validity of the prosecutor's peremptory challenges to the two prospective jurors. If the trial court determines the prosecutor's reasons for excusing the two jurors were not constitutionally valid, and grants defendant's *Wheeler/ Batson* motion, reversal and retrial is required. If the trial court determines the prosecutor's reasons for excusing the two jurors were constitutionally

---

[11]We are aware *Batson v. Kentucky* was also a burglary case, and that the time between trial and remand was two years. But beyond that, we know nothing of the facts pertaining to Batson's trial or the Kentucky justice system which led the Supreme Court to order the matter remanded. We therefore cannot conclude that their facts were sufficiently close to ours to suggest the two cases should be similarly treated.

valid, and denies defendant's *Wheeler/Batson* motion, defendant's conviction is ordered reinstated.

Crosby, Acting P. J., and Seymour, J.,* concurred.

A petition for a rehearing was denied February 22, 2000, and the opinion was modified to read as printed above.

---

*Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.