Filed 4/22/14  P. v. Keovongxay CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C067721 |
| Plaintiff and Respondent, | (Super. Ct. Nos. SF115451A, SF115451B, SF115451C) |
| v. | |
| JOHN KEOVONGXAY et al., | |
| Defendants and Appellants. | |

After a jury found defendants John Keovongxay, Joseph Michael Hernandez, and Nicholas Eugene Castaneda guilty of several felonies, the trial court found each defendant had various priors and sentenced each defendant to prison.  Defendants contend the trial court erred in denying their motion alleging that the prosecutor exercised peremptory jury challenges based on discriminatory factors, in violation of *Wheeler*/*Batson* principles.  (See *People v. Wheeler* (1978) 22 Cal.3d 258; *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69].)  Defendant Keovongxay also contends no

1

substantial evidence supports his conviction for simple kidnapping. Finding no error, we shall affirm the judgments.

## FACTUAL AND PROCDURAL BACKGROUND

The facts are not disputed on appeal. On July 29, 2010, Keovongxay pointed a gun at a woman in front of her Stockton house, while Hernandez ordered the woman and her son inside. They demanded money and stole a laptop before fleeing as the police approached. Hernandez was caught nearby, as was Castaneda, driving the getaway car. Then, in a nearby house around the corner, a man saw Keovongxay hiding in his backyard. Keovongxay ordered the man into his house, and demanded his keys. The man was able to get into his garage and call the police. Keovongxay fled, but the police captured him the next day.

The jury found each defendant guilty of residential robbery in concert and first degree burglary of an inhabited residence (Pen. Code, §§ 213, subd. (a)(1)(A), 459),[1] and additionally found Keovongxay guilty of kidnapping, robbery, and false imprisonment (*id*., §§ 207, 211, 236). The jury found Keovongxay personally used a firearm (§ 12022.53, subd. (b)), and found as to the other defendants that another principal was armed (*id*., § 12022, subd. (a)(1)).

The trial court found Keovongxay had a prior serious felony and strike (first degree burglary) and had served four prior prison terms, Hernandez had served two prior prison terms, and Castaneda had served one prior prison term. (See §§ 667, subds. (a)(1), (b)-(i), 667.5, subd. (b), 1170.12, subd. (b).) The trial court sentenced defendants to prison, imposing terms of 36 years and 8 months on Keovongxay, 12 years on Hernandez, and 11 years on Castaneda.

Each defendant timely appealed.

_____

[1] Undesignated statutory references are to the Penal Code.

## DISCUSSION

### I

### *Wheeler/Batson Motion*

Defendants contend the trial court should have granted their *Wheeler*/*Batson* motion.  We conclude the trial court properly denied the motion.[2]

A.     *The Law*

Prospective jurors (hereafter jurors, for convenience) may be peremptorily challenged for subjective or trivial reasons, including a juror's in-court demeanor, provided the reasons are genuine and not discriminatory.  (See *People v. Jones* (2011) 51 Cal.4th 346, 361; *People v. Allen* (2004) 115 Cal.App.4th 542, 547.)

When a party (usually the defendant) alleges its opponent is exercising challenges discriminatorily, the trial court applies a three-step process, as follows:

> " 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' " (*People v. Mills* (2010) 48 Cal.4th 158, 173 (*Mills*).)

_____

[2]  Keovongxay concedes he did not join in the *Wheeler*/*Batson* motion, but claims this is irrelevant because *if* the motion had merit, his trial counsel was necessarily incompetent in failing to join the motion.  But the record reflects a plausible tactical reason for trial counsel's actions.  Keovongxay was Laotian, unlike his Hispanic codefendants.  His counsel may not have shared the codefendants' counsels' concerns about the number of Hispanics on the jury.  That would relegate Keovongxay to habeas corpus, where the reasons for his counsel's actions can be explored.  (See *People v. Pope* (1979) 23 Cal.3d 412, 425-426, disapproved on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10; see also, e.g., *People v. Bolin* (1998) 18 Cal.4th 297, 317 [trial counsel may have shared prosecutor's dissatisfaction with challenged jurors].)

But if a trial court asks for the prosecutor's reasons and assesses their validity in the course of determining whether the defense has made out a prima facie case, we "skip to" the third stage and evaluate those reasons. (See *Mills*, *supra*, 48 Cal.4th at p. 174.)

However, we do not review the prosecutor's reasons de novo:

> "Review of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*People v. Lenix* (2008) 44 Cal.4th 602, 613-614.)

B.    *The Jury Selection Proceedings*

The prosecutor exercised peremptory challenges against nine jurors, alternating challenge opportunities with the defense attorneys. In order, these nine jurors, along with their apparent backgrounds as described on the record by the trial court, were as follows:

A.G., White.

R.F., Hispanic.

L.G., African-American.

J.V., Hispanic.

L.A., Hispanic.

After some new jurors were questioned, the People passed.

W.M., African-American.

The People again passed.

A.S., White.

R.Q., Filipino.

M.C., Hispanic.

After Castaneda's counsel made an off-record comment about the challenges, the trial court commented that it "notice[d] a rather alarming string from the People. It looks like seven of their nine challenges are minorities. One Filipino, most Hispanics, one black and I think that starts to create -- actually, two blacks, African Americans. I think that does start to suggest a pattern, systematic pattern of minorities . . . ."

After additional critical comments from the trial court regarding the prosecutor's challenges, Castaneda's counsel stated his concern was "not just Hispanics but minorities" including Hispanics. After a break, Castaneda and Hernandez, but *not* Keovongxay, made a *Wheeler/Batson* motion. (See fn. 1, *ante*.)

The trial court repeatedly stated it had not found a prima facie case, but ultimately asked the prosecutor for his reasons for striking the four Hispanic jurors, and considered those reasons on the merits. Castaneda's counsel specified the motion was based on challenges to the four Hispanics, but argued that Filipino juror R.Q. should be counted as a fifth Hispanic because many people from the Philippines "are Spanish" due to Spain's former control of the Philippines, a view the trial court implicitly rejected by asking the prosecutor to state his reasons for challenging the four Hispanic jurors, but not the Filipino juror.[3] (See Part I-C-4, *post*.)

The prosecutor's stated reasons for three of the Hispanic jurors were as follows:

M.C. was only 18 years old and "I wasn't sure if she had the appropriate amount of life experience to be on this particular jury."[4]

_____

[3] Hernandez claims the trial judge improperly ruled that Hispanic defendants could challenge only Hispanic jurors. The record shows only that the trial court agreed with the prosecutor that there were different cognizable groups at issue, and evidently did not find a prima facie case as to African-Americans or Filipinos.

[4] He had challenged juror A.S., in his 20's, for the same reason, and planned to challenge another juror in her 20's. He also stated all the remaining prospective jurors "I believe, are over the age of 28, at least."

R.F. had not been to high school and "was confused" during questioning by Hernandez's counsel, and the prosecutor had unsuccessfully challenged R.F. for cause earlier.

J.V., too, gave confusing answers, particularly about whether he would follow the law, or follow the morals and ethics taught to him by his parents.[5]

Castaneda's counsel argued M.C. would likely be pro-law enforcement because her uncle was a deputy sheriff. R.F. had been chosen as a juror in the past, and although that past case had been "resolved" he could understand what was going on, and both R.F. and J.V. had answered questions without problems. Hernandez's counsel, too, had understood R.F.'s and J.V.'s answers.

The trial court denied the motion, finding the reasons given were race neutral and not pretextual, specifically, R.F. had limited education and gave confusing voir dire answers, M.C. was young and inexperienced, and J.V. gave answers suggesting he might follow his parents' teachings over the law.

C.     *Analysis*

On appeal, Castaneda challenges the findings as to Hispanic jurors J.V. and M.C., and argues the matter must be remanded to determine why the prosecutor challenged Filipino juror R.Q. Hernandez adds a claim about the challenge to Hispanic juror R.F.[6] As we explain immediately *post*, because the record supports the finding that the

_____

[5] Defendants do not contest the reasons given as to L.A.

[6] Hernandez also seeks review as to the stricken African-American jurors. But, as Castaneda correctly points out, neither he nor Hernandez asked that the challenged African-Americans "be included in the motion." The *trial court* mentioned African-Americans. But the discussion by *counsel* in their motion pertained to Hispanics, and whether Filipinos counted as Hispanics. Accordingly, we decline to address claims about African-American jurors. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1157 (*Howard*).)

6

prosecutor challenged each of the jurors at issue for reasons other than their ethnic background, the trial court properly denied the *Wheeler*/*Batson* motion as to those jurors.

### 1. *Juror J.V.*

J.V. was 54, had been born in Venezuela, and had lived in the county for 25 years. He had been called for jury duty before, but had not been selected as a juror. He answered "no" to the question whether he could return a guilty verdict without regard to punishment or other consequences, if the People proved the case beyond a reasonable doubt, and explained "They did not prove the case." When asked whether "the moral grounding you got from your parents is more important than all the things you hear strangers say," he answered "Yeah, I think so."

This record supports the trial court's finding that the prosecutor had legitimate concerns about J.V.'s ability to follow the law. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 116-117 (*Crittenden*) [no prima facie case where juror "had shown indecisiveness and could not decide whether she would be able to follow the law"]; *People v. Davis* (2008) 164 Cal.App.4th 305, 311, 313 (*Davis*) [prosecutor's explanation that juror was late and unable to follow instructions supported by record showing juror "was not punctual and she did not otherwise do well in following the court's directions"].) The voir dire by Castaneda's counsel did not dispel the concern that J.V. would follow the moral precepts instilled by his parents over things heard from "strangers[.]" The fact the prosecutor did not press J.V. on this point or ask him many questions does not show so-called "desultory" questioning which may contribute to a finding of discriminatory purpose (cf. *People v. Bell* (2007) 40 Cal.4th 582, 597 (*Bell*) [in finding a prima facie case, a relevant factor may be " 'the failure . . . to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all' "]), because the existing record contained ample information to strike this juror.

7

### 2. *Juror M.C.*

M.C. was 18 and lived in San Joaquin County her whole life. She was a single renter, had finished high school, and worked as a sales clerk. Her uncle was a deputy sheriff in the county. When questioned for hardship, she had answered that she was "the one who works" in her family and would be able to work nights during the trial.

The trial court could rationally credit the prosecutor's concern about M.C.'s maturity, given her age. (See *People v. Sims* (1993) 5 Cal.4th 405, 430-431; *People v. Gonzales* (2008) 165 Cal.App.4th 620, 631.) That she may have been a *very responsible* 18 year old, as defendants argue, does not mean the prosecutor's reason was pretextual. The fact the prosecutor did not question her does not reflect "desultory" questioning indicating pretext, but instead inferentially supports the view that the prosecutor viewed her immaturity as an immediate disqualifier, which view is also supported by the fact that the prosecutor struck other young jurors. (See fn. 3, *ante*.)

### 3. *Juror R.F.*

R.F. was 36 and had lived in the county his whole life. He had not completed high school. He stated he had never served on a jury, but then answered a series of questions about his prior service. He also answered that he, or a relative, or someone close to him had *not* witnessed a crime, but that the matter *had been* reported to the police. During questioning by Hernandez's counsel, R.F. explained he "must have put the wrong thing" and had never been on a jury and "probably got the wrong thing again."

The confusion R.F. expressed supports the trial court's finding that the prosecutor had rational doubts about his ability to understand and follow the law. (See *Crittenden*, *supra*, 9 Cal.4th at pp. 116-117; *Davis*, *supra*, 164 Cal.App.4th at p. 313.)

### 4. *Juror R.Q.*

Defendants contend the matter must be remanded for the trial court to consider the prosecutor's reasons for challenging Filipino juror R.Q. (See *People v. Tapia* (1994) 25 Cal.App.4th 984, 1031-1032.) The trial court declined to "count" R.Q. as a Hispanic,

and did not find a prima facie case had been established regarding Filipinos. Contrary to Castaneda's claim, the trial court did not impliedly find a prima facie case regarding all minority jurors, but only Hispanic jurors, inasmuch as it was those jurors about which it questioned the prosecutor. Hernandez properly acknowledges this point, but incorrectly asserts this was because the trial court found defendants lacked standing to challenge other jurors. (See fn. 2, *ante*.)

a.      *Filipinos as Hispanics*

As trial counsel pointed out, the question of how to "count" Filipinos can be complicated. Some Filipinos have Hispanic surnames, and people with such surnames have been held to be a cognizable group. (*People v. Trevino* (1985) 39 Cal.3d 667, 683-687, disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194, 1219-1222.) But this juror did not have a Hispanic surname, and generic categories of " 'nonwhites' " and " 'people of color' " are not cognizable groups. (See *People v. Davis* (2009) 46 Cal.4th 539, 583-584; *People v. Neuman* (2009) 176 Cal.App.4th 571, 574, 575–578; *People v. Clay* (1984) 153 Cal.App.3d 433, 455, fn. 4.)

Although it may be hard to tell whether a juror belongs to a particular cognizable group, ordinarily, a juror *should not* be questioned about race or ethnicity. (See *People v. Trevino, supra,* 39 Cal.3d at p. 687; *People v. Motton* (1985) 39 Cal.3d 596, 604.)

Moreover, a juror may belong to multiple cognizable groups, and physical appearances and surnames may mislead. As one appellate court has noted: "jury venires daily include Cubans named O'Rourke, Indonesians named Opdyke, and Anglos named Gomes. Every trial judge has encountered red-haired, freckle-faced Cardenases and Hispanic-looking Maguires. The country is a melting pot—and proud of it—and a large part of the great folly of stereotyping is that nowhere on earth have race and ethnicity become harder to determine than they are here." (*People v. Garcia* (2000) 77 Cal.App.4th 1269, 1280.)

9

For example, in *Bell*, *supra*, 40 Cal.4th 582, the trial court had assumed that two jurors were Filipino but observed "membership in that group was not always easy to determine[.]" (*Id.* at p. 595.) In *People v. Alvarez* (1996) 14 Cal.4th 155, a Filipino juror surnamed Del Rosario (an Hispanic-sounding surname) was included among Hispanic jurors for *Wheeler*/*Batson* purposes, but because the trial court found no "prohibited intent on the prosecutor's part, it deemed it unnecessary to reach the question whether Puerto Ricans [or] Filipinos, as defendant suggested, came within the cognizable group of Latinos, or whether each or either of them constituted such a group in their own right." (*Id.* at pp. 194-195.) In a more recent case, our Supreme Court suggested Filipinos were a separate cognizable group within the " 'Asian' " category. (See *People v. Burney* (2009) 47 Cal.4th 203, 226.) That view is broadly consistent with governmental data-collection usages. (See, e.g., Cal. Dept. of Finance, Cal. Statistical Abstract (48th ed. 2009) Table C-16, p. 62 [listing "Filipino" as a distinct "Ethnic Origin" category from "Mexican American and other Spanish"]; Standards for the Classification of Federal Data on Race and Ethnicity, 62 Fed.Reg. 58782, 58786-58787 (Oct. 30, 1997) [" 'Asian' " includes a " 'person having origins in any of the original peoples of . . . the Philippine Islands' "; while " 'Hispanic' " refers to persons who trace their origin or descent to Mexico, Puerto Rico, Cuba, Central and South America, and other Spanish cultures"].)

In this case, there was no dispute the juror was Filipino. Based on the fact that she did not have an Hispanic-sounding surname, we conclude the trial court properly rejected the defense effort to "count" R.Q. as Hispanic rather than Filipino.[7]

b.     *Prima Facie Case as to Filipinos*

We disagree with defendants' apparent view that the trial court should have found a prima facie case as to Filipinos.

_____

[7] We note the juror questionnaire did not ask about former or "maiden" names, information that might have clarified this married juror's cognizable group(s).

10

"The high court has explained that the defendant is required to 'raise an inference' that the exclusion was based on group or race bias. . . . [¶] The trial court's determination that no prima facie showing of group bias has been made is subject to review to determine whether it is supported by substantial evidence. [Citation & fn. omitted.] We examine the record of the voir dire and accord particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand." (*People v. Jenkins* (2000) 22 Cal.4th 900, 993-994.)

R.Q. was 26, married, had lived in the county for 2 years, and worked for Apple, Inc., which is why she moved to Stockton. She finished high school, and had a technical college degree. She had been a juror in a domestic violence case where no verdict was reached and had a positive experience. She believed peace officers were more truthful than other witnesses. When questioned by the prosecutor about her prior jury service, she said the jurors had all agreed except one, but she felt "justice was still served" and that she thought the process had been fair.

No other Filipino jurors had been stricken, none of the defendants were Filipino, and they do not argue any of the victims were Filipino. As stated in a similar case:

> "Assuming, as did the trial court, that [two excused jurors] are Filipino-Americans and that Filipino-Americans are, for purposes of *Wheeler* and *Batson*, a cognizable group distinct from other Asian-Americans, the record nonetheless fails to show how many other Filipino-Americans were in the venire and were not challenged by the prosecutor. The prosecutor did not use an extraordinary number of his peremptory challenges against members of this ethnic group, nor does defendant claim the prosecutor's voir dire of these prospective jurors was unusually desultory or that in respects other than their ethnic background or national origin the two were especially heterogeneous. Neither defendant nor any of the victims or percipient witnesses to the crimes were Filipino-Americans. Under these circumstances, the prosecutor's excusal of two Filipino-Americans does not create an inference of discrimination." (*Bell*, *supra*, 40 Cal.4th at p. 599.)

11

Here, as explained *ante*, there was no *Wheeler/Batson* motion based on challenges to Filipino jurors, *apart from* the contention that juror R.Q. should have been "counted" as another Hispanic juror. R.Q. was only 26, and the prosecutor had challenged or was planning to challenge at least three other jurors in their 20's based on lack of maturity, and as Hernandez notes, the prosecutor apparently had a preferred "age range" of "above 28" which R.Q. did not meet. (See fn. 3, *ante*.) Because the record raises no inference of discrimination, but instead " 'suggests grounds upon which the prosecutor might reasonably have challenged' " R.Q., we sustain the trial court's implied finding that no prima facie case was established as her. (*Howard*, *supra*, 1 Cal.4th at p. 1155)

II

*Sufficiency of the Evidence of Simple Kidnapping*

Keovongxay claims no substantial evidence supports the kidnapping count, because as a matter of law he did not move the victim sufficiently.

In assessing this claim, "We review the whole record in a light most favorable to the judgment to determine whether it contains substantial evidence, i.e., evidence that is credible and of solid value, from which a rational trier of fact could find beyond a reasonable doubt that the accused committed the offense." (*In re Ryan D*. (2002) 100 Cal.App.4th 854, 859; see *People v. Barnes* (1986) 42 Cal.3d 284, 303-304.)

Keovongxay jumped over the kidnapping victim's fence and hid in his backyard. When the victim confronted him, Keovongxay, who was visibly armed, ordered the victim into his house and demanded his car keys. The victim walked "[a]bout six feet" to get into his house, and as he entered, he yelled to his daughter-in-law to "lock herself in," whereupon Keovongxay grabbed the victim's keys. The victim then ran to his detached garage and called the police. Although the victim's side yard had a metal fence along the alley, there was a solid wooden fence between the alley and his "private backyard," and a passerby would not have seen the victim in the backyard. While the victim was outside,

12

he could hear "a lot" of police sirens, and after defendant fled, the victim saw police cars in the street.

Keovongxay was charged with kidnapping for purposes of robbery ("aggravated" kidnapping), but was acquitted of that charge and was found guilty of the lesser offense of simple kidnapping. (§§ 207, subd. (a), 209, subd. (b).)

Simple kidnapping is defined as follows: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).)

One element of kidnapping is "asportation," which originally required moving the victim outside the jurisdiction, and later at least to "another part" of the county. (See Fricke, Cal. Criminal Law (10th rev. ed. 1970) Kidnapping, p. 207; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, §§ 283-285, pp. 1111-1117.) The amount of movement required has changed over a long history not necessary to recount here.

*Aggravated* kidnapping, that is, kidnapping to commit some other crime, such as robbery, "requires movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself." (*People v. Rayford* (1994) 9 Cal.4th 1, 12.) This requires considering "the 'scope and nature' of the movement," and "the context of the environment in which the movement occurred." (*Ibid*.)

In *People v. Martinez* (1999) 20 Cal.4th 225, our Supreme Court expanded the asportation element as applicable to *simple* kidnapping, as follows:

13

"In cases involving simple kidnapping, the instructions currently provide that the victim must have been moved 'for a substantial distance, that is, a distance more than slight or trivial.' [Citation.] [W]e conclude it would also be proper for the court to instruct that, in determining whether the movement is ' "substantial in character" ' [citation], the jury should consider the totality of the circumstances. Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes. [Fn. omitted.]

"While the jury may consider a victim's increased risk of harm, it may convict of simple kidnapping without finding an increase in harm, or any other contextual factors. Instead, as before, the jury need only find that the victim was moved a distance that was 'substantial in character.' [Citations.] To permit consideration of 'the totality of the circumstances' is intended simply to direct attention to the evidence presented in the case, rather than to abstract concepts of distance. At the same time, we emphasize that contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*People v. Martinez, supra*, 20 Cal.4th at p. 237.)

The jury in this case was given a version of the pattern instruction (CALCRIM No. 1215) in relevant part providing as follows: "[S]ubstantial distance means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors, such as whether the movement increased the risk of physical or psychological harm, increased the danger of foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection."[8]

In *People v. Arias* (2011) 193 Cal.App.4th 1428 (*Arias*), Arias forced victim Luna at gunpoint to walk 15 feet into Luna's apartment so Arias could determine if rival gang

_____

[8] On appeal, Keovongxay quotes the written instruction, which added a factor not read to the jury, namely, "whether the distance the other person was moved was beyond that merely incidental to the commission of robbery[.]"

14

members were present.  (*Id.* at p. 1431.)  *Arias* rejected the claim that this movement was too insubstantial to support a simple kidnapping charge:

> "A rational trier of fact could have concluded defendant was on a mission to locate and shoot a TMC gang member and, in an effort to do so, he pointed a gun at Luna, and followed him to the apartment to search for TMC gang members. Luna testified he did not want defendant to enter his apartment but was 'scared' and 'just following [defendant's] directions.'  A rational trier of fact could have concluded that Luna was involuntarily moved 15 feet to the inside of his apartment in order to allow defendant to facilitate his search for TMC gang members.

> "The movement of Luna increased his risk of harm in that he was moved from a public area to the seclusion of his apartment.  Similarly, by scaring Luna into moving away from a public place, it was less likely defendant would have been detected if he had committed an additional crime.  These factors support the asportation requirement for kidnapping." (*Arias, supra*, 193 Cal.App.4th at p. 1435.)

Even in cases of *aggravated* kidnapping, a short distance may suffice if the movement significantly changed " 'the context of the environment.' "  (See *People v. Diaz* (2000) 78 Cal.App.4th 243, 247-248.)  In this case of *simple* kidnapping, the victim was forced from his backyard into his home, increasing the risk of harm by defendant, and decreasing the victim's freedom of movement, his opportunity for escape, and the chance he or defendant would be overheard by passersby.  That suffices.  (See *Arias, supra*, 193 Cal.App.4th at p. 1435; see also *People v. Shadden* (2001) 93 Cal.App.4th 164, 168-170 [victim dragged nine feet into a room in the back of a store; asportation requirement of *aggravated* kidnapping met, in part because "Shadden placed [the victim] out of public view.  This made it less likely for others to discover the crime and decreased the odds of detection"]; *People v. Smith* (1995) 33 Cal.App.4th 1586, 1594-1595 [movement of victim "40 to 50 feet from a driveway, which was open to street view, to the interior of a camper" not incidental to rape].)

Contrary to Keovongxay's view, the fortuitous fact the victim was able to escape to his garage while defendant was distracted does not mean his movement into the house did not increase the *risk* of danger to him. Nor does the fact that the victim's backyard was "private" mean that he was equally at risk whether he was in the backyard or inside the home, as defendant contends. Those were arguments for the jury to consider in drawing inference from the facts, but the jury could rationally conclude, as it had been instructed, that defendant's forcible movement of the victim did increase the risk of harm to the victim, reduced his chance to escape, and exposed him to the risk of additional victimization by defendant.

Keovongxay relies in part on *People v. Hoard* (2002) 103 Cal.App.4th 599, but that case is inapposite. Unlike this case, *Hoard* involved a conviction for aggravated kidnapping and a defendant who moved the victims within the interior of a store. (Cf. *People v. Corcoran* (2006) 143 Cal.App.4th 272, 279-280 [distinguishing *Hoard*].)

Nor are we persuaded by defendant's reliance on *People v. Williams* (1970) 2 Cal.3d 894, where the victim was moved around a service station and its adjacent outdoor area and the People made no claim that this movement increased the victim's risk of harm. (*Id.* at pp. 899-900, 902-903; see also *People v. Daly* (1992) 8 Cal.App.4th 47, 57 [moving victim about 40 feet within a parking structure did not increase her risk of harm].) In this case, the jury could rationally find that moving the victim from his backyard into the more confined environment of his house increased the risk of harm to him and decreased the chance defendant would be detected by police audibly converging on the area, whether or not the victim's backyard was visible to the public.

Accordingly, substantial evidence supports the simple kidnapping conviction.

**DISPOSITION**

The judgments are affirmed.


      DUARTE      , J.


We concur:


      ROBIE      , Acting P. J.


      MAURO      , J.